All right, sir. Mr. Durio, good morning. Your Honors. I'm Stephen G. Durio, also known as Buzz Durio, and I'm here for the appellants, World Tree, Wes, and Priscilla Perkins, and I'd like to try to get down to the nitty-gritty as quickly as possible by discussing four particular transactions which were—I didn't pick them. They were picked by the government for their complaint and for the—by the expert, the government's expert, for its expert report. And I think if we discuss these four transactions, you will see immediately and clearly how we have such stark differences in our view of what the evidence in this case actually shows or does not show. And the four transactions are a July 2012 transaction we call—we refer to as Melannex, a January 2014 transaction which is we call the Apple transaction. I'm sorry. Say the dates a little again. July what? Melannex. No, the first one. It was the date. Oh, July 2012. Melannex. And a January 2014 transaction which we refer to as the Apple transaction, those are on pages 17 and 18 of Dr. Notton's report, respectively. And the third and fourth really are discussed almost as one transaction, but they're two, and they're in February and July of 2014, and they involved Twitter. Now, if you'll bear with me just a second, in the— Somebody made money out of that. I'm sorry? Somebody made money out of Twitter. Yes. Actually, I think everybody made money. In this case, everybody in Twitter eventually made money. But if I can start with Melannex. In that transaction, it's isolated because—Can you tell me where you're going with this? I think I understand the case and the issue, but what's—by choosing four, what do you—what's your purpose? Well, this is the closest and the closest that the government gave us of what they thought was check. And if you look at those transactions themselves, they overwhelm any statistical inference you could ever have in this case from 30,000 feet looking at all 22,000 transactions. And we tried in our case to show that transaction by transaction. Let me make an analogy. I hope—I know analogies are sometimes dangerous, but in this case, we had a statistical expert who said, there's a needle in that haystack. And how do I know it? I don't have to look at every piece of straw. I can tell you statistically that this is a pattern in which—and the probability is there's a needle in that haystack. And we had an expert who said, I'm going to look through every piece of straw. And there's no—there's an explanation for everything in here. This was a bench trial to Judge Juneau, right? That's correct. And when I read the trial, I saw the SEC gave closing, trying to explain all the incriminating factors, and then the SEC seemed to give rebuttal. Did you make a closing argument? No, Your Honor, I reserved my closing argument to the post-trial brief because Judge Juneau at the time—I don't know if you are personally familiar with Judge Juneau, but he's in a wheelchair and he gets up. It's great difficulty for him to attend trial and do all that kind of stuff. He does a good job. He keeps a good sense of humor. But he had suggested a number of times that . . . Okay, that's fine. I understand. So your point is they had an expert, statistical expert, Needon. You had an expert, Theriault, right? Right, a certified financial fraud examiner. And they're competing about how to interpret these particular transactions. So, yes, my question is, are you saying that the district court committed clear error in preferring the testimony of Needon over Theriault? And if that's your argument, just tell me why. It's not just—I do think there's clear error in that because the dichotomy is not Theriault and Neidon so much as statistical inference or specific direct evidence. And we rebutted every time a specific item came up, we rebutted it like I was going to go into with these four answers. Go ahead. But you saw the battling. It's an Alice in Wonderland kind of approach because you don't even know what to battle in a statistical case like this. The expert repeatedly said, Neidon repeatedly said, I can't tell you there's cherry picking in this case. Well, wait a minute though. Isn't there also a future of this case whereby your client represented to their clients that he and she were not going to be trading in this for their own one? My clients did say in their ADV that they would not trade. They did say in their ADV that they would trade. And it was, in my view, misleading because it's very difficult to interpret. That's a minor footnote. If my clients had been convicted—well, excuse me. If they had been found guilty of that alone, I wouldn't be here. Your challenge is to the preponderance finding of the district court as to the state of mind fraudulent, correct? You're saying where's the evidence to support it? There's no scientific— I share your concern about experts being able to stamp somebody as having that state of mind. But I think what we're pressing at is that the district court seemed to make findings that showed other circumstantial evidence other than the expert. One would be a misrepresentation. The other would be LeBlanc, if that's the fellow who didn't do so well. As soon as he complains, he starts doing well. That you could make inferences from those. Well, the district court just didn't believe my client. Well, that's important too, right? That's huge. If the district court hears and discredits, they can draw an inference from that. Well, I understand, Your Honor. I don't know how to address that except to say that if my client—let me give you the—on that point, in the very first example, in the Melinex example, when this was discussed in court, the judge at the end of my client's explanation said, so you think that rationale would apply to all the transactions in this case? And that shows you a state of mind, Your Honor, on the judge's part, which is, hey, I'm looking at statistical inferences. I want a universal explanation. This district judge, I read, he was very engaged throughout. I'm not sure. I think he knew the facts well. I guess, here's my question. The case you cite as most supportive is the case Slocum. Yes, sir. But in Slocum, the individual was credited that he was pursuing investment strategies that could explain it. But as we just discussed, here, the judge who presided over the trial came to the opposite conclusion. Well, I understand, Your Honor. All I can tell you is that in—one of the strategies, for example, is dollar cost averaging. One of the strategies is progression into a position, not moving the market, all techniques that you have to use for a large, high-income investor like the supposedly disfavored LeBlancs. You have to use that. My client just couldn't go in and say, well, I need $2 million worth of—he had $2 million of cash in his account. He just couldn't go into the market and say, I need $2 million of Apple stock, because the market's going to move. The market's going to move. You're moving against yourself. The price is going to rise. The judge asked me, he said, are you telling me that there are investors who will buy in a falling market, knowing that they don't want to have a first-day gain? They know the market's falling. They would rather end up with a first-day loss. I said, absolutely. And why is that? You said that or your client said that? Pardon? You said that or your client said that? Well, my client said it, too. Okay. My client explained dollar-cost averaging, progressing into a buy, splitting the order so you wouldn't move the market. He said all that stuff. It was all—here's what my client basically said. He said, look, I had a client that has $2 to $3 million of cash in his account every six months. It's not coming from his investments. It's coming from outside income. He's plopping in an account and say, invest this for me. Every six months, he's got $2 to $3 million. He said, it took me—well, in fact, those two accounts traded during the period in question an average of 900 per account, 900 transactions per account. The average investor has very little cash in his account, and he's got 100 transactions over the three-year period. So he was having to handle one client extremely different, and basically that gets into statistics because the basic job of a statistician is to eliminate confounding errors. Anybody can say there's a correlation between X and Y, but then to get to causation, you have to eliminate the confounding factors that might be causing the difference. You know, age and weight gain, for example, is a perfect example. The older you get, the average person weighs more. Let me ask you a question. I mean, the SEC didn't get onto this until WorldTree had already been terminated by Schwab, right? Yes, ma'am. Well, isn't that indicative of something? I mean, you can throw up a lot of dust about trading strategies and so on, but I think Schwab probably knows a lot more than the average judge about trading, the validity of various trading strategies or the manipulation of those strategies, and if they terminate somebody, I guess that's indicative of reasonable suspicion. Well, Your Honor, my client, listening to the audio of this argument, was very glad to hear you say that because my client wanted me to make this a trial of Schwab, and he wanted me to point out that Schwab had been pursued by and settled with the SEC for a lot of stuff that they started, and that Schwab was rolling over people like my clients because— as in a criminal case, Your Honor, if you're a minor player in a criminal case, you roll over by giving them the names of the big players or other people. Schwab basically had set up omnibus accounts for my client, for example, and Schwab had insisted on doing things like, oh, no, no, you can't send us an allocation before with a trade. We don't know the average price. You've got to have an average price to allocate. We can't allocate until after the trade, so send us allocations after the trade. Now, if you listen to Ms. Niden or the SEC, they say, oh, you have to allocate before the trade, and my client says, absolutely you have to allocate before a block trade because you don't know how much money you're trading. You have to look at all your clients, see how many of them can afford to have available cash, don't already have this investment opportunity or something similar in their portfolio, and you've got to put that list together, and he testified I do it every day. It's a spreadsheet. Now, do I print out the spreadsheet and keep it every day thinking that I'm going to get sued by the SEC? No, I didn't, but every day. You cannot see, and if I could go through these examples, or if you would go through them, I know you don't want to spend a lot of time on particular examples, but for example, one of these cases, there's 50 to 60 clients, Niden calls them favorite clients, that there's 50 to 60 clients that were involved in the trade, and they all get allocated. Niden made the basic incorrect assumption that every trade that went through this account was an aggregate trade. Apple wasn't an aggregate trade. She said it was cherry picking because my client LeBlanc ended up with a loss because he was the only one that had $700,000 to buy Apple stock that particular earnings announcement day, and he made the trade himself. It went through the omnibus account, but suppose, according to Niden, that's evidence you were sticking him with the losses. He lost $78,000 on Apple that day. Why didn't you allocate that to all your other clients? Why didn't they get a share of that loss? Because they didn't buy it. I didn't put them on my list. They didn't have the money in the account. Period. That's the explanation, and for every one of these particular transactions, you can get an explanation like that. The government has yet to identify a specific instance which they will admit, which they will contend is cherry picking. Look at their brief. That was the point of my reply brief. There's still nothing from the government. We kept saying, look, tell us it's a needle or which needle you found. We want to talk about whether or not you got it out of this haystack. Nothing. Niden repeatedly said, I don't look for cherry picking. I'm not trying to do that. This is my first cherry picking case. I don't know what a typical cherry picking case looks like. I'm not going to answer the question. When she was asked by the government those questions, she said, I don't get into particulars. I don't get into specifics. Well, my thought when I started reading about cherry picking was Hillary Clinton and Donald Trump. Mr. Matro, thank you for coming down here. Many government attorneys have been reluctant to do that. Thank you, Your Honor. Did you try the case? I did not. Our enforcement attorneys tried the case. May it please the court, Daniel Matro for the Securities and Exchange Commission. I'd like to take a minute to review the district court's findings and the totality of the evidence. As investment advisors, defendants Perkins and Worldtree were fiduciaries. They had an affirmative duty to act in their client's best interests. They also specifically represented that they treated all clients fairly and equitably. But as the district court found, Perkins and Worldtree engaged in a form of securities fraud called cherry picking that was completely antithetical to those obligations. Cherry picking occurs when an advisor places block trades through an omnibus account without identifying which accounts the trades are for, waits to see how the trades perform, and then allocates the profitable trades to their own or other favored accounts and the unprofitable trades to disfavored accounts. Now, I mean, he's been begging, and he did in closing, what's an example of the most, what is your, the most and you say the commission identified, but I guess I sort of, from a common sense viewpoint, I'd love to know which one would you tell us to look to? Well, so there are, you know, a few specific trades. Just the most, the most unfavorable. Apple, Mellanox trades. The Apple trade is discussed by Dr. Niden at 713 to 14 and 2857. 713, 14, okay. Mellanox technologies trade discussed at 1712 and 13 and 2858. There's also the table of day trades, which are with realized trades at 2832. You would agree in Dradle, is that how you pronounce it, Dradle? Yeah, as far as I know. Okay. The commission went through specific little irregular cherries, but that was never done in this trial. You've given me helpful sites, but... I think the, the, the evidence here is particularly compelling. So the main argument that he makes is that the commission, you know, doesn't, has to definitively prove a specific cherry picked trade, but he didn't keep allocation records that you could just examine to discover whether he was cherry picking. So short of, short of a confession or incriminating communications, it's not clear what good it would do to focus... Remember, I mean, the proposition I thought I read, you're asking us to affirm and the one that was clearly argued in closing argument by the SEC, and I'm virtually quoting the closing argument, the data is the center. And so I guess what I'm asking is the government isn't pushing as a rule of law that an expert alone with patterns could prove fraudulent state of mind? Not necessarily. I mean, the data, the data here is, as a district court found compelling evidence... You'd need something more. In the criminal context, you agree 704 would say you could never do that. I think you don't have to get to that question here because as you've, as you've noted, there are, there's a series of evidence that supports the statistical evidence. I mean, so just to start with the statistical evidence, you know, the way you ferry out, ferried out cherry picking is looking at trading data over time. It's a pattern of conduct over time. And when the commission's expert did that here, she found stark and extraordinarily improbable disparities in first day performance between the favored and disfavored accounts. And she testified that the probability of, of those disparities occurring by, through allocations made without regard to first day performance is less than one in a million. And there was no other plausible explanation other than cherry picking. So we have that evidence. And when you combine that with the fact that Perkins plainly and that when Schwab, Charles Schwab asked as part of its cherry picking investigation, he Perkins couldn't provide any of the allocation records that he was required to keep by his own testimony was he destroyed it daily? He destroyed it daily, but it's unclear what he even kept. So he says he kept records that he destroyed daily, but we don't know what those records were. The records that he produced were, you know, gibberish, basically number. What cases are instructive for us? Because cherry picking is a little like what I remember as check guiding. They're not frequent and they do involve experts, but can you point to any case where liability, maybe you're not pushing this, which sounds right. It rests on an expert's interpretation of the data alone. Yes. So, I mean, we're not pushing because we don't have to here. We think the evidence, the statistical evidence is very strong. I mean, the fact that it's one in a million, basically, to get these kinds of experts, I guess, I think the fact that he was discredited, took the stand. The court didn't agree and he destroyed data. That's pretty solid. Exactly. So, you know, I was going to, you know, mention some of the other evidence, as you said, his alternative explanations aren't supported by any evidence in the record. The pattern shifted after the disfavored client complained about his returns. You have the discredit, the district court's credibility determination that he just wasn't telling the truth when he denied cherry picking on the stand. And then you have the misrepresentations that facilitated. Those are all important, I think, because when I read the two cases I could find, you probably know them all. They're normally less than half a dozen. Case called Kellan. What the courts are saying is you can use expert as they're saying this to the SEC. You can get by a motion to dismiss. You can get summary judgment. But experts alone can't prove liability. And what they tend to, correct me if I'm wrong, they really say what's going to be determinative is in the long term did the guy have losses, the victim. And that's what's a little odd here because you're not contesting that LeBlanc, who's the prime victim, actually made a million plus more than the favored. Well, he may well have, considering all of the trades, made a positive return. But Dr. Nyden testified that, you know, when you're the victim of cherry picking over a period of time, it's very likely that you would have made. You know the Kellan case I'm citing? Yeah. And didn't they highlight, oh, this is going to protect us against experts finding liability. Did they or didn't they in the long run, the victim, actually get victimized? But I think it's also sort of a matter of common sense. You wouldn't want to be the client who consistently gets the losing trade. But I want to be the client that ends up making a million seven more than the supposed favored person, which it sounds like LeBlanc was. And the favored clients made even more. So they were disadvantaged by. Is that true? Well, I thought the proposition was that the victim here in his realized gains vastly exceeded them. Well, in terms of dollar amount, because he invested more, he had more money in investments. So it was a dollar amount. But the returns. What is the government's theory, then, about how LeBlanc was harmed, then, if he vastly outperformed the so-called preferred clients? Again, I don't think he outperformed. He had a smaller return over a larger amount of money. Right. What was your theory? Maybe you don't. I don't know if you have to show this or not. But what was your theory about how he was harmed by the cherry picking? It's that if he was treated fairly and equitably, he would have made more money than he would as someone who was consistently disadvantaged, handed losing trades in a rising market. It may be that. Your theory is he did have losses. Yeah, I mean, the district court suggested and Dr. Niden testified that when a client is that they would have made more money. And the commission has said that. And I think it was Dradle. But in the cases that we cite in our brief, that, you know, even when that's one of the problems that makes cherry picking so hard to find is because you can take skim small amounts off the top and hide your fraud. Because maybe. 10B5 cases associated with WorldTree. Are there 10B, are they involved, the firm involved in any 10B5 cases? Correct. I mean, you know, the SEC is down on him. Schwab was down on him. I would think some of the clients might have been unhappy and sued. I'm not aware of any other actions other than this one. But this involved both allegations of cherry picking and misrepresentations. I mean, if you're if you're if your theory is that this one fellow got less money than he should have gotten, the disgorgement amount is surely not proportional to what he allegedly lost, is it? Well, so the disgorgement is tethered to the amount of unlawful gain generated. I understand that. And and that that gain is. So you couldn't, in other words, you couldn't take it away from the favored clients. Yeah. So what what what the defendants did, what Perkins did is take profitable trades that might have gone had they been fairly and equitably allocated to all of the accounts and to the disfavored accounts and took them for himself. And at that at that point, at that that time of the violation, the profits generated by that unlawful conduct is are those first day returns. Couldn't you couldn't you have gotten exactly the same amount of disgorgement by saying they had misled their clients about whether they were personally trading or not? I think I think that would also justify the disgorgement. I think the district court focused on disgorgement for the unlawful gains from cherry picking, but obviously the misrepresentations were part of it. Did the district court include the fees paid to Schwab? How would that be? Why was that proper? So it was a couple of answers to that, Your Honor. It was Perkins burden below to present evidence about the commissions paid to Schwab and to explain why and how the commission's approximation should have been adjusted for them. Lew was decided several months before the trial, but he didn't raise the issue at all or present any evidence below about the commissions, the size of the commissions. And he compounds that failure again in this court by failing to substantiate any particular deduction in this court. He merely speculates that the court that the commissions might have been paid and argues about the amount of commissions and argues that all of the commissions paid to Schwab should have been for some reason deducted, but doesn't explain why commissions paid by his clients, for example, and by the disfavored client would reduce the measure of his own wrongful gains. And then again, after the commission pointed out that he hasn't pointed to any specific evidence in the record, he doesn't mention the issue at all in his reply brief. So he just hasn't established that the district court abused its discretion when it found that the commission had proposed a reasonable approximation and it hadn't been rebutted. We'll go over the evidence again besides the statistical evidence that indicates that there was cherry picking. Sure, I'd be happy to. So you have the fact that it's undisputed that Perkins had the opportunity to cherry pick. He waited until the end of the day after earnings announcements. Obviously. That Charles Schwab investigated them for potential cherry picking, you know, saw probably some of the same patterns, and when they asked for the records that Perkins was required by his own policies and procedures to keep, he wasn't able to produce them and also wasn't able to produce them in the commission's investigation. You have the fact that his alternative explanations are not supported by any evidence that the client complained. You have the district court's credibility determination that Perkins just wasn't telling the truth. And, you know, in a case like Gann, where the evidence was in equipoise, which said a fax to the defendants or the governments to accept, the court said even when it was in equipoise, the credibility determination is overriding and tips the balance in favor of the government. I don't think we have equipoise here. We have strong facts for the government here. Then you also have, as I said, the misrepresentations found, misrepresentations that facilitated the fraud by making clients think that their trades were being fairly and equitably. And that may be a lot from which a judge could draw an inference, but you don't have, am I right, you don't have long-term losses by the alleged victim, and you also did or didn't have direct motive evidence. Because in Dradle, I remember this quote, I need a chunk of money. So the government went out of its way to show that the money manager was in dire financial distress. Did, was any of that here as to Mr. Perkins? You don't have direct motive evidence, but you just have all of this evidence that this is what he was, that this is what he was doing and that his demeanor at trial was evasive, argumentative, that he just wasn't believable. You weren't conceding Judge Higginson's point. I don't think that the victim here did not sustain long-term losses, or were you? No, I'm not conceding that. We think that a consistently disadvantaged client like this in cherry-picking cases, you know, even if they make money, because over this period was a rising market, a lot of people were making money in the markets, even if, and I'm, even if they had shown that they were able to show that his favorite client made money, he very likely would have made more money, had a higher rate of return, than had he not been the victim of cherry-picking. You mean this fellow, so basically you don't, you've proven that Perkins was a very capable trader. Well, I'm not sure about that, because if you look at the overall, if you take all of the gains. Well, maybe not compared to Warren Buffett, or, you know, BlackRock, or whoever those people are, or Vanguard, but he must have been capable, because you're just saying he didn't allocate enough gain to the people who should have gotten gain, who were all getting gains. I think there were periods where everyone may have made money, but if you look at the expert's disgorgement calculation, where she accumulates all of the gains for all, and losses for all of the clients, the overall gain for the whole practice was negative, was slightly negative, and this was in a rising market. The reason he got consistently positive returns for himself and for the vast majority of clients is because, or, you know, a rational explanation for that is because— After looking at all the results, I thought he made twice what even the favored people made, so his allocations to himself were the biggest. Am I right or wrong about that? There was not favored versus disfavored, but Perkins— Yeah, Perkins was way, you know, just extraordinarily off the charts high returns, I think 2.66% average daily return, which is as compared to, you know, less than negative 1% for the disfavored. Yes, he, at trial, said that's the biggest thing. He's telling them he's not going to invest in the same stocks, but then he does, and then he gives the most to himself. This is— Yeah, this is investing in largely overlapping stocks, and the disparity is even greater. When you look on announcement days, he traded on many announcement days, earnings announcement days, where you often get, where you sometimes get unexpected news that moves the stock, and there, the Perkins accounts had over 6% return, average daily return, and the disfavored accounts even less, significantly less, no, less than negative 2%, I believe. So the disparities are real, and it's just extraordinarily unlikely that they would have occurred absent cherry picking, and so that alone is strong evidence, but again, we don't have to insist that that alone is enough, because there's plenty of other evidence. I'm happy to answer any other questions that the Court may have, but otherwise, we ask that the Court affirm the judgment of the District Court. Thank you very much. All right. Thank you. Mr. Durrio, rebuttal. Thank you, Your Honor. First of all, in terms of disgorgement, we didn't get to that part of it in our main presentation. It's in our brief, but this does not pass the Liu test. When this case started, the government contended they could measure disgorgement by first day returns. Our argument was, well, you might be able to measure, but you can't say it's causation. You can't show that that's cherry picking. And Liu was just a few months before our trial. Frankly, I didn't appreciate what Liu actually says. When it says you've got to have net profits, it means actual, actual, real dollars. You have to subtract the dollars. Net means actual, real dollars. You look at the Liu case, you'll see that. This case doesn't have any actual dollars in it. Have there been any lawsuits by any of the investors here? Only Mr. LeBlanc, only a piggyback action, which has been stayed from the very beginning because he wanted to await the outcome of the . . . That's number one. Number two, are your clients still in business? No, Your Honor, and that's clear from the record. I think I gave you a footnote on that in the reply brief. They've been . . . Undisputed that the commissions to Schwab are in the amount that was ordered, disgorged? Absolutely not. What the expert said is . . . Well, I was back on disgorgement. Did the commissions paid from WorldTree to Schwab end up being amounts that were ordered disgorged as a result of this case? Yes, because they were never deducted. Right. No, that's . . . We're never talking about real money in this case. What they say, what the expert says is, I think you guys made this much more excess profits on first day returns, unrealized gains over this period of time, $300-something thousand dollars, and I'm using the figures without deducting commissions, anything else. That's what the expert does. So, I mean, this can't possibly pass the Lew standard. My client didn't destroy records. My client used a spreadsheet every day, methodically. Just didn't keep records. He overwrote that spreadsheet. He had assistants who set up the spreadsheet. Here's the cash in the accounts that have enough cash to start investing. Here's a list of them. Now, you picked investments, and we're going to allocate them, and you placed the order. There was testimony the district judge heard that each day the allocation records did not survive. Correct? No. The testimony is very clear. The spreadsheet was overwritten. It was never reduced to paper. I know, but so there were no . . . After he did his allocations at the end of each day, there's nothing left for anyone to say how'd you do that. Well, you can go back to the statements and look at those accounts, and that's what my client did in defense. He said, wait a minute, look at the statements. The statements show how much was in the account at the time. For example, Apple Trade. All of the accounts together didn't have $750,000 in it, free cash. That was a single trade for a single client, LeBlanc. If we'd have made millions, would they have said, oh, you have to allocate that to the other people? That's what their . . . Her hypothesis is allocation requires pro rata on aggregate orders, and she didn't distinguish between aggregate orders and single client orders. You did cross her on a lot of this and the single account inclusions in her states. Yes. But what about my question that it turns out Mr. Perkins ends up by far the best off? Absolutely not. Not true? First of all, no real dollars. If you look at the real dollars, take the Apple and the Melnyx transaction. The Melnyx transaction, they criticize us because we didn't put LeBlanc in it. Well, he wasn't in it because he was already in Melnyx. He had made a lot of money in Melnyx, and he sold a lot of Melnyx after and made a lot of money. That doesn't come into the Melnyx transaction at all. In Melnyx, he made over $258,000 in subsequent trades, record 2137, record on appeal, 2137. In Apple, he made $50,000 in Apple. If you look at all of his trades, not just the one loss they pointed out, record 2059. In Twitter, they point out a trade in February and a trade in July. What they don't point out to you is that my client, dollar cost averaging, progressing into a position for a long-term gain, bought Twitter on August 4th, August 5th, August 11th, August 12th, August 14th, August 25th, and 26th. This is in the record. He made $174,000 in Twitter over that period of time, as opposed to what they show you as a first-day loss because the market went down when he bought. Oh, he lost $78,000. Not a dollar changes hands. He takes that same stock through all of these because he's buying cheap. When the market's going down, that's when you get low cost. A big investor buys when the market's falling a stock that he knows is solid, like Apple or Melanex or whatever. That's the way you trade for a big investor. Howard Methodology skews this completely. First-day results, not only can they not be the basis of a discardment program. I'm sorry, Your Honor. We understand. I apologize. We agree. Thank you, Your Honor. Okay. Thank you very much.